| | | |
|---|---|---|
| HHD-FA16-6071228-S | : | SUPERIOR COURT |
| FRANCELIA SAKON | : | JUDICIAL DISTRICT |
| | | OF HARTFORD |
| v. | : | AT HARTFORD, CONNECTICUT |
| JOHN A. SAKON | : | MAY 4, 2023 |

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE ROBERT NASTRI JR., JUDGE

A P P E A R A N C E S :

Representing the Plaintiff:

ATTORNEY DENNIS O'TOOLE
53 Benton Street
Manchester, Connecticut 06040

Representing the Defendant:

JOHN A. SAKON -- Ordering Party
Self-Represented Party

Recorded and Transcribed By:
Johanna Maldonado-Daniels
Court Recording Monitor Trainee
90 Washington Street
Hartford, Connecticut 06106

1    THE CLERK:  Good morning. We are on the record

2    on Sakon versus Sakon, docket number HHD-FA16-

3    6071228. Counsel, please identify yourself for the

4    record.

5    ATTY. O'TOOLE:  Dennis O'Toole, representing Ms.

6    Sevine.

7    THE CLERK:  I'm going to ask the parties to

8    raise your right.

9    (Francelia Sevine and John A. Sakon were duly sworn

10   in)

11   MS. SEVINE:  Yes.

12   MR. SAKON:  I do.

13   THE CLERK:  Please, state your name and address

14   on the record. Starting by --

15   MS. SEVINE:  Sevine, Francilia Sevine P.O. Box

16   1504690530, Hartford, Connecticut, 06106.

17   THE COURT:  Thank you.

18   MR. SAKON:  John Sakon, 28 Fenwick Drive,

19   Farmington, Connecticut. Your Honor, I recently had a

20   hip surgery so I would ask to be, permission to be

21   seated during sometimes the argument.

22   THE COURT:  Granted.

23   MR. SAKON:  And in addition, I would like Mr.

24   O'Toole sworn as a material witness.

25   THE COURT:  Denied. Sit down. Sit down. This is

26   your motion for contempt, Mr. Sakon.

27   MR. SAKON:  Yes, Your Honor. I will note for the

1    Court that a mandatory resolution plan was ordered by

2    this Court on 4/21 at eleven o'clock. We were to

3    proceed to family relations in order to work out our

4    differences. I will note for this Court that the

5    plaintiff refused to attend to these mandatory

6    sessions.

7         MS. SEVINE:  That's not true.

8         MR. SAKON:  And I would like to submit the

9    parenting plan that I had ready for that session.

10   Because we were supposed to present a resolution

11   plan. I have prepared --

12        ATTY. O'TOOLE:  Your Honor --

13        MR. SAKON:  -- a parenting plan. I have prepared

14   a parenting plan to submit, and I'd like to submit

15   that as evidence in the court at this time.

16        THE COURT:  Well, we are here on your motion for

17   contempt in which you alleged that Ms. Sevine has

18   stopped you from seeing your son for seven months. Do

19   you want to be heard on that?

20        MR. SAKON:  Well, that's part of this hearing

21   because this hearing was --

22        THE COURT:  Well, that's the only part of this

23   hearing. Is that what you are looking to present?

24        MR. SAKON:  I understand that, Your Honor, but

25   there was a mandatory resolution plan ordered on 4/21

26   --

27        THE COURT:  Well, we are going to address your

1    motion for contempt.

2         MR. SAKON:  Okay, Your Honor.

3         THE COURT:  Which was filed before the proposed

4    resolution plan date. This was filed on January 30.

5    So if you want to address the motion for contempt.

6         MR. SAKON:  Okay. Your Honor, I call Ms. Sevine

7    to the stand.

8         THE COURT:  Ma'am, would you come up here.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

```
 1   F R A N C E L I A   S E V I N E
 2     of P.O. Box 1504690530, Hartford, Connecticut, being
 3   previously sworn, was examined, and testified under oath as
 4   follows:
 5              THE COURT:  You may know that the microphone
 6         doesn't amplify your voice it just records. You need
 7         to speak up so we can get a record.
 8              MS. SEVINE:  Yes, Your Honor.
 9              THE COURT:  You may inquire.
10   DIRECT EXAMINATION BY MR. SAKON:
11     Q   Ms. Sevine, do you have a son?
12     A   Yes.
13     Q   Look at me, Ms. Sevine. Please don't look at your
14   attorney.
15              THE COURT:  Excuse me, ask question. Don't
16         direct anyone in the courtroom to do anything. That
17         is my job.
18              MR. SAKON:  Your Honor, there's -- there --
19              THE COURT:  Sir, ask a question.
20              MR. SAKON:  Okay. I'm just pointing out to the
21         Court and for the record that Ms. Sevine is getting
22         verbal clues from Mr. O'Toole at this time.
23              THE COURT:  Do you have a question to ask?
24              MR. SAKON:  Yes.
25   BY MR. SAKON:
26     Q   Do you have a son?
27     A   Yes.
```

1    Q    What's his name?

2    A    Odin Sakon.

3    Q    Okay. Does he have a father?

4    A    Yes.

5    Q    When was the last time your son saw his father?

6    A    I don't remember.

7    Q    You don't remember?

8    A    No, I don't remember.

9    Q    Okay. Did he -- has your son seen his father this

10   year?

11   A    I don't think so. No.

12   Q    Okay. Has your son seen the father since the

13   memorandum decision issued by Judge Nguyen?

14   A    Judge Nguyen. No.

15   Q    Okay. So why is that the case?

16   A    Because no third-party therapeutic agency has

17   contacted me to start the intake process for visits to

18   occur. And, in addition, I have yet to receive proof that

19   his father is in therapy which there should be quarterly

20   reporting that the father has engaged in therapy.

21   Q    Are you the gatekeeper to both of those items?

22   A    I don't know what that means.

23   Q    Okay. Is it your job to review whether the father is

24   receiving therapy?

25   A    I am to receive proof of that or my attorney.

26   Q    Or your attorney? Are you the gatekeeper? Are you the

27   one to decide whether he's in therapy or not? Is that your

1 responsibility to your understanding?

2    A   I don't understand that question but what I am saying

3 is that I am supposed to be provided proof.

4    Q   Were you not provided proof?

5    A   No.

6         MR. SAKON:  Just one second, Your Honor.

7         THE COURT:  Certainly.

8         MR. SAKON:  It's here somewhere.

9 BY MR. SAKON:

10   Q   Ms. Sevine, did you receive a letter from Dr.

11 Lauerman that was unsigned?

12   A   No.

13   Q   Did you not complain in our -- I'm sorry. Do the

14 parties communicate through Our Family Wizard.

15   A   Do you and I communicate through Our Family Wizard?

16 Is that -- I'm not sure is the question about me and you?

17   Q   Yes, do we --

18   A   Okay --

19   Q   -- communicate through Our Family Wizard.

20   A   Yes.

21   Q   Wasn't -- you -- didn't you not request the -- the

22 therapist of John Sakon through Our Family Wizard?

23   A   I -- what I remember -- I'll just say what I

24 remember. It might just help us save some time. You provided

25 a letter that was unsigned from Dr. Lauerman which had dates

26 that were already passed when you sent the letter to my

27 attorney, Mr. O'Toole, Attorney O'Toole. And you also sent

```
 1   the unsigned letter through Our Family Wizard later. And
 2   then I asked for proof of current therapy, and you sent the
 3   same letter signed but still with no current dates.
 4             MR. SAKON:  Okay. If I may. I'm sorry. I just
 5        have one copy, I'm sorry. (Indiscernible) Thank you.
 6             MS. SEVINE:  Thank you.
 7   BY MR. SAKON:
 8   Q    Do you recognize this letter?
 9   A    It looks like probably the letter you sent through
10   Our Family Wizard.
11   Q    It says from John Sakon to Francelia Sevine. Is that
12   correct?
13   A    Are you talking about the letter? Or the -- our --
14   Q    I'm talking about the cover.
15   A    The -- okay. The Our Family Wizard message report,
16   yes.
17   Q    Did you read that on 2/10/2023 at 3:28 p.m.?
18   A    That's what it says.
19   Q    Okay. And doesn't it say attachments Dr. Lauerman
20   letter?
21   A    No.
22   Q    It says subject Dr. Lauerman letter. Does it not?
23   A    Oh, yes, it does.
24   Q    And it says attachments. Does it not?
25   A    Yes. It says R-L-R-J-L Sakon 011023.
26   Q    Okay. Isn't -- look at page two, please. Wasn't that
27   letter, the letter provided to you?
```

1    A    I'm not completely 100 percent sure. It's similar. It

2  maybe -- but I don't see any dates here and I remembered --

3    Q    Well, the date is January 10th on top of the letter.

4  Is it not?

5    A    Right. So that's the date of the letter, however, you

6  didn't send it to my attorney or to me until after that date

7  and after January 17th.

8              MR. SAKON:   Okay. Your Honor, I like to offer

9         this as a full exhibit.

10             ATTY. O'TOOLE:   No, objection.

11             THE COURT:   Copy of the report.

12             MR. SAKON:   Yes. I have more copies. I just have

13        to pull out my copy.

14             THE CLERK: (Indiscernible)

15             THE COURT:   All right. Exhibit A is a full

16        exhibit.

17             MR. SAKON:   All right.

18  BY MR. SAKON:

19    Q    Would you read the first line of that letter, please,

20  that Dr. Lauerman says?

21    A    You may use this letter as you see fit.

22    Q    Oh, I'm sorry, the first line in the first paragraph.

23    A    You have requested psychotherapy in compliance with

24  the Court's request as a condition of visitation with your

25  child.

26    Q    Okay. And you didn't think that letter was sufficient

27  to satisfy the -- Dr. Lauerman saying to whom it may

1  concern. Isn't that letter sufficient to show John Sakon in

2  fact has entered therapy?

3     A    I don't -- I feel that it's insufficient to say that

4  you are currently engaged in therapy.

5     Q    Oh, I'm sorry. Okay. We'll go through that again. Are

6  you the gatekeeper?

7     A    You were just asking me my opinion.

8     Q    Okay.

9     A    So that's my opinion.

10    Q    Okay. In your opinion, are you the gatekeeper as to

11 whether Mr. Sakon is in conformance with the orders of the

12 Court?

13    A    I'm not sure how to answer that. Whatever gatekeeper

14 means? What does that mean?

15    Q    (Indiscernible) You decided that Mr. Sakon was not in

16 therapy in according to the orders of the Court. Is that

17 correct?

18    A    I've -- I decided that this was not proof of you

19 being engaged in therapy in the current moment when I

20 received it.

21    Q    When was that?

22    A    I don't remember. It was on --

23    Q    What's the date? (Indiscernible)

24    A    It was on February 8th.

25    Q    And did John Sakon not send you one sooner?

26    A    Yes. An unsigned letter.

27    Q    And it was unsigned therefore John Sakon got Dr.

1   Lauerman to sign the letter and sent it to you. Is that

2   correct?

3       A   I don't know what he did.

4       Q   Well, obviously, you had a letter that was unsigned

5   and then you received a letter that was signed.

6       A   Yes.

7       Q   So if John Sakon has entered therapy according to the

8   Court, why have -- why are you refusing custody? Excuse me,

9   why are you refusing visitation?

10      A   As I said, I don't consider this being proof that

11  you're currently engaged in therapy. I did try to verify it

12  with Dr. Lauerman and received no response. And, in

13  addition, the visitation needs to be scheduled through a

14  therapeutic agency, supervised visitation agency. And I have

15  yet to be contacted by anyone to start the intake process

16  for our son.

17      Q   What is the therapeutic visitation agency?

18      A   It's a -- an agency that provides services for

19  supervising visits.

20      Q   Is that you're understanding or are you quoting some

21  law?

22      A   That's my understanding.

23      Q   Okay. Is there any definition of therapeutic

24  visitation agency in the law to your understanding?

25      A   I have no idea.

26      Q   Okay. So you are the gatekeeper deciding what's a

27  therapeutic visitation agency or not? Is that correct?

1    A    No. There is a list of therapeutic supervised

2  visitation agencies on the government judicial website.

3    Q    Isn't that for juvenile court? And aren't those

4  agencies hired by D.C.F in order to provide supervision for

5  parents whose children are in custody of D.C.F?

6    A    That's not my understanding. And we've also had

7  supervised visitation previously at Klingberg which is one

8  of the agencies on the list.

9    Q    And we've also had agreed to supervised visitation by

10  third party. Is that correct?

11    A    Can you restate that.

12    Q    The past.

13    A    What did you say? I'm sorry.

14    Q    We had visitation with third parties from neither

15  Klingberg or Today's Youth, is that correct?

16    A    Yes.

17    Q    Okay. So you agreed to supervised visitation by third

18  parties in the past. Is that not correct?

19    A    I don't remember.

20    Q    Well, you remember that there were third parties, did

21  you object to at that time?

22    A    I don't remember. I might of.

23    Q    So you are not aware of any law defining what is

24  supervised visitation agency is? You said that, is that

25  correct?

26    A    Yes, I'm not an attorney.

27    Q    What makes you the gatekeeper of what is the

1   supervised visitation agency. Is that correct?

2      A    I'm not saying I'm a gatekeeper.

3      Q    But you've denied visitation because there was no

4   supervised visitation agency.

5      A    I haven't denied visitation. I am waiting for the

6   therapeutic agency to contact me so that visitation can

7   commence. And that was communicated --

8      Q    There is no question, pending.

9             MR. SAKON:  One for him. One for her. And

10            judge's copy when he is ready to receive.

11            MS. SEVINE:  Thank you.

12   BY MR. SAKON:

13      Q    Ms. Sevine, have you stated publicly that you never

14   want your son to see his father again? Yes or no.

15      A    No.

16      Q    I give you the exhibit that you have right here.

17            MR. SAKON:  Mark it for I.D., Your Honor.

18            THE COURT:  You can mark it for I.D.

19   BY MR. SAKON:

20      Q    Ms. Sevine, this is a message chain between John

21   Sakon and Francelia Sevine. Would you agree to that? It's a

22   chain of messages you exchanged with John Sakon on Our

23   Family Wizard

24      A    Yes.

25      Q    Okay. Turn to page two. The message on 2/7/23. Sent

26   from John Sakon to you. You read that message on 2/10/2023

27   at 3:28 p.m. Is that correct?

1    A    That's what it says.

2    Q    Okay. Would you please, read the entire message to

3  this Court. It's only short. The short message so read it to

4  the Court.

5    A    My psychologist, Dr. Richard Lauerman, would like a

6  visitation and therapy session with dad and Odin on

7  02/15/2023 at 3:00 p.m. This is during my scheduled

8  visitation. His office is at 1031 Farmington Avenue in

9  Farmington. Dr. Lauerman's office is literally across the

10  street from Forest Park, my complex. As I will be recovering

11  from my hip operation, I would ask you to bring Odin to his

12  therapy session. SD school lets out at two fifteen which

13  gives enough time for travel. His phone number is 860-677-

14  2550, John.

15    Q    Okay. Now I like you to refer back to Dr. Lauerman

16  letter and Exhibit A. Does that letter note Dr. Lauerman

17  qualifications?

18    A    He's a license provider.

19    Q    Yes. But would you, please, read his qualifications?

20  Just a second, I gotta find --

21    A    As a licensed provider in this state and a member of

22  the American Psychological Association, specifically,

23  division eight, Society for Personality and Social

24  Psychology. I believe I possess the capacity to be of

25  assistance.

26    Q    Okay. You don't feel Dr. Lauerman qualified to be a

27  supervised in a supervised visitation agency?

1    A    No, I don't. He's not a third party. He's your

2    therapist not the child's therapist. He's not in a

3    therapeutic role for the child.

4    Q    But he was serving as a supervised -- for the

5    supervised visitation.

6    A    It's not appropriate because he's your therapist. If

7    he is even your therapist.

8    Q    So you're -- once again being gatekeeper to make John

9    jump through hurdles in order to see his son? Even though he

10   arranged to have a Doctor of Psychology act as the

11   supervisor. Not a session just a supervisor for the session.

12   That was not acceptable to you?

13   A    Dr. Lauerman is not a third party therapeutic

14   supervised visitation agency.

15   Q    How is he a first party? Is he part of this lawsuit?

16   A    He's your therapist supposedly.

17   Q    Therapeutic supervised visitation? That doesn't

18   qualify with a psychologist with a Ph.D? He's a licensed

19   psychologist in the state of Connecticut. He doesn't

20   qualify?

21   A    I'm not sure what you are asking me.

22   Q    Ms. Sevine --

23             ATTY. O'TOOLE:  It's argumentative, Your Honor.

24             THE COURT:  Overruled.

25             MR. SAKON:  I'm sorry.

26             THE COURT:  His objection is overruled.

27             MR. SAKON:  What was his objection?

1          THE COURT:  Argumentative.

2          MR. SAKON:  Okay. Would the, clerk, please, I

3      mean read back the last question.

4          MS. SEVINE:  The clerk?

5          THE COURT:  He means the monitor.

6          MS. SEVINE:  Oh.

7      (Monitor reading back last question)

8  BY MR. SAKON:

9      Q    So Dr. Lauerman is a licensed therapist in the state

10  of Connecticut does not qualify to conduct a supervised

11  visitation between father and child. Is that what you are

12  saying?

13     A    I think I said that he is not a third party

14  therapeutic supervised visitation agency.

15     Q    Ms. Sevine, or should I say Mrs. O'Toole. I don't

16  know how to address you at this point.

17     A    It's Ms. Sevine, thank you.

18     Q    Okay. So that Mr. O'Toole, is your husband, correct?

19     A    Attorney O'Toole, is my husband, correct.

20     Q    He's acting as your attorney here today. Is that

21  correct?

22     A    Yes.

23     Q    And you don't think that's a conflict of interest?

24     A    No.

25     Q    Okay. Mr. O'Toole, funded the --

26          ATTY. O'TOOLE:  Your Honor, this is getting off

27      the path, it's not relevant.

1      THE COURT:  Sustained.

2      MR. SAKON:  Okay.

3  BY MR. SAKON:

4     Q    So going through this chain. You say on the next one

5  2/10/2023, please provide proof that you are currently in

6  therapy. I'm confused about that. Mr. Sakon has said that he

7  would like to meet with Odin, and Dr. Lauerman on his

8  office. In a therapy session with Odin and dad at 2/15 and

9  three o'clock. So how could Mr. Sakon not be in therapy if

10  he wants Odin to meet with his therapist two days after the

11  2/13. Aren't you being an obstructionist here?

12     A    No.

13     Q    You don't want Odin and his father to meet, do you?

14          ATTY. O'TOOLE:  Again, Your Honor, this is

15       argumentative.

16          THE COURT:  Overruled. You may answer the

17       question.

18  BY MR. SAKON:

19     Q    You don't want Odin and his father to meet? Yes or

20  no.

21     A    Oh, I thought -- I thought you were saying that.

22     Q    You don't want Odin and his father to meet?

23     A    Not at all. I'd like them to meet in a therapeutic

24  supervised visitation agency.

25     Q    Okay. Let's go to the next one on 2/13, to Francelia

26  Sevine, supervised visitation from John Sakon. It says in

27  that, does it not say there -- oh, I'm sorry you read that

1  on 2/15/2023 9:32 a.m. Is that correct?

2      A    I'm sorry which one are we looking at?

3      Q    Looking at February 13, 2023. An email sent from John

4  Sakon, that you read on at 2/15/2023 at 9:32 a.m.

5      A    Okay.

6      Q    Okay. Is that correct?

7      A    Is it correct that I read it?

8      Q    Yes.

9      A    Well, it says it right there.

10     Q    I'm asking you did you read it or did someone else

11 read it?

12     A    That's what it says. I don't know.

13     Q    Is anybody else reading your Our Family Wizard?

14     A    No.

15     Q    Is Mr. O'Toole reading them?

16     A    No.

17     Q    So, therefore, if you're the only one logged into the

18 account, it's you.

19     A    I've already said, that's what it says. So I've said

20 it three times.

21     Q    Okay. Actually, it does not that email say, Dr.

22 Lauerman is a licensed psychologist who has undertaken

23 numerous supervised visitation assignments. He has been

24 gracious enough to have supplied his phone number to you if

25 there are any questions. It is 860-677-2550. Does it not say

26 that?

27     A    Yes.

1    Q    Okay. Let's go to the top of the email. February 17,

2    2023, as I have said twice before, does it not -- would you

3    please read the second paragraph.

4    A    The first message?

5    Q    Hmmmm.

6    A    As I have said twice before supervised visits can be

7    scheduled with Odin through a therapeutic supervised

8    visitation agency. To date no supervised visitation agency

9    has contacted me to set up visitation.

10   Q    So you are acting as a gatekeeper again. Is that

11   correct?

12   A    Is that a question?

13   Q    You're act -- isn't that you're acting as a

14   gatekeeper?

15   A    I don't like this word, gatekeeper. So I can't answer

16   that question.

17   Q    Well, you're the one who's in control of the gate

18   whether Odin is going to see his father or not. Is that

19   correct?

20   A    I don't -- I don't know what it means.

21   Q    Who is -- who is guarding the gate whether Odin can

22   see his father or not?

23          MR. SAKON:  I'm sorry Your Honor, I'll try to be

24          quiet. I get loud.

25          MS. SEVINE:  So if we had a therapeutic agency

26          involved, there would be a therapist that would work

27          with Odin. Who would schedule the intake process for

```
 1              Odin to begin visitation with you. And at this point,
 2              probably reunification services too because it's been
 3              so long since the visitation started.
 4   BY MR. SAKON:
 5      Q    Oh, so now you're putting additional requirements
 6   upon the --
 7      A    I'm not putting requirements I'm just --
 8      Q    But you're asking for additional requirements now?
 9      A    -- trying to get you to understand what's actually
10   going on.
11      Q    I understand you don't want me to see my son.
12   Wouldn't that be clear from your correspondence?
13      A    No, it's not.
14      Q    Then why -- why --
15      A    I think my correspondents is very clear about my
16   intention.
17      Q    In your mind, is it in the best interests of the
18   child that the child has not seen his father since July of
19   last year? Yes or no.
20      A    I can't say at this point.
21      Q    Is it in the best interest of the child --
22              ATTY. O'TOOLE:  Your Honor, that's already been
23         asked. He's getting argumentative here.
24              THE COURT: Well.
25              MR. SAKON:  What?
26              THE COURT:  Finish your question.
27   BY MR. SAKON:
```

1  Q   Is it in the best interest of the child not to see
2  the father?
3  A   I would say it's in the best interest of the child to
4  see the father in a therapeutic setting.
5  Q   No. Is it in the best interest of the child to see
6  the father --
7  A   I can't --
8           ATTY. O'TOOLE:  The question -- the question
9       been asked and answered.
10          THE COURT:  Overruled.
11          MR. SAKON:  What?
12          THE COURT:  I overruled the objection.
13 BY MR. SAKON:
14 Q   Is it in the best interest of the child to see the
15 father?
16 A   Just see him period with no constraints?
17 Q   Yes. That's a yes or no question --
18 A   Then it's no. No.
19 Q   No, it's not in the best interest of the best
20 interest of the child to see the father?
21 A   Not unless there is a third party --
22 Q   Your attorney can rehabilitate you. So you don't feel
23 that the child should see the father because it's not in the
24 child's best interest?
25 A   I think I answered that question.
26 Q   Okay. So when are you going to allow the child to see
27 the father?

1    A    When a third party supervised visitation agency

2    contacts me to start the intake process for Odin. So that

3    supervised visitation can occur.

4    Q    Okay. What are the cost of the supervised visitation

5    agency?

6    A    I don't know.

7    Q    About $100 an hour, isn't it.

8         ATTY. O'TOOLE:  Your Honor, he's testifying.

9         THE COURT:  Sustained.

10        MR. SAKON:  Okay.

11   BY MR. SAKON:

12   Q    Is it possible to arrange for John Sakon to arrange a

13   supervised visitation agency to pick up the child at school

14   at 2:15 and bring back the child at seven o'clock? Do you

15   know any agencies that work those hours?

16   A    I am -- I don't know. So all I can say is that I am

17   waiting for some person at an agency, a case worker to

18   contact me.

19   Q    I think you do know -- supervised visit agencies work

20   business hours, don't they?

21   A    No, they have evening they -- I mean our visits were

22   definitely in the evening. They do weekends so.

23   Q    Okay. John Sakon has been declared by the Court to be

24   indigent. Is that correct?

25   A    I have no idea.

26   Q    Well, you did have Mr. Sakon arrested six times on

27   fourteen felonies and misdemeanors, did you not?

1    A    I don't have people arrested.

2    Q    Was John Sakon arrested upon your complaints six

3    times for violation of protective orders, and for disorderly

4    conduct on your complaints? Yes or no.

5    A    Yes.

6    Q    And what happened in criminal court as to all those

7    charges?

8    A    They nolled them.

9    Q    What?

10   A    They nolled them.

11   Q    They -- didn't -- weren't you there for the jury

12   trial of John Sakon, on -- on the nine felonies that you --

13   A    I think it was on one charge, I mean, but --

14   Q    Not one charge. It was eight felonies.

15   A    I don't remember.

16   Q    Nine felonies, nine felonies that jury trial was

17   under.

18   A    Well, I know that the rest of them were nolled.

19   Q    Was John Sakon facing 80 years in prison on the

20   charges that he went to jury trial for --

21          THE COURT:  Why is this relevant to the contempt

22          motion?

23          MR. SAKON:  I'm sitting there saying that this

24          is a very vindictive mother. That is going to do

25          everything in her power in order to destroy the

26          family, to destroy the family financially, destroy

27          John --

1         THE COURT:  Isn't this about whether you

2        complied with Judge Nguyen's order?

3         MR. SAKON:  What?

4         THE COURT:  This is about whether you complied

5        Judge Nguyen's order. Not whether you were acquitted

6        by a jury to some charge.

7         MR. SAKON:  Okay.

8 BY MR. SAKON:

9   Q   So if John Sakon has a total of nine hours of

10 visitation a week. And if a visitation agency, what you

11 describe is a visitation agency, I don't know what a

12 visitation agency is. That would be $900 a week. What, is

13 that not correct?

14   A   I don't have any knowledge of what the charges are at

15 an agency.

16   Q   Okay. But if it was $900 a week, that would amount to

17 --

18         ATTY. O'TOOLE:  It's a hypothetical. It's not

19        appropriate, Your Honor.

20         MR. SAKON: (indiscernible)

21         THE COURT:  Sustained. She is not an expert

22        witness.

23         MR. SAKON:  Okay.

24 BY MR. SAKON:

25   Q   Where is John Sakon going to get that money to

26 arrange that supervised visitation that you are requiring?

27   A   I don't know.

```
1    Q    Is there an agency that Mr. Sakon can apply to that
2    would cover the cost?
3              ATTY. O'TOOLE:   Again, Your Honor, this isn't
4         really within the knowledge of the witness.
5              THE COURT:   She can say.
6              ATTY. O'TOOLE:   Okay. All right.
7              MS. SEVINE:   Yeah, I don't know.
8    BY MR. SAKON:
9    Q    You don't know? Okay. Would -- have you inquired
10   whether any supervised visitation agencies on your approved
11   list provide free services?
12   A    No.
13   Q    Okay. So where is even a well employed father not a
14   retired 68-year-old man going to get the money to pay for
15   all of these visitations?
16   A    Well, he could use the money he didn't pay in child
17   support to have a visit.
18   Q    Okay. John Sakon is not paying child support?
19   A    No.
20   Q    Didn't your social security go up in 2023?
21   A    No.
22   Q    It didn't go up to cover the additional child support
23   that John Sakon was supposed to pay?
24   A    You're suppose to pay child support.
25   Q    How much?
26   A    Not --
27   Q    How much?
```

1    A   Not -- not social security.

2    Q   I'm sorry. Is the social security part of the child

3 support payment?

4    A   No. It's a benefit to the child --

5    Q   It's a benefit to the father --

6    A   -- directly.

7    Q   not to the child. It's the father's social security.

8    A   We are getting far afield.

9    Q   Please answer the question. How much social -- how

10 much is the payment that John Sakon is supposed to make to

11 you?

12    A   I don't remember.

13    Q   Isn't it $12?

14    A   I don't remember. It could -- it could be. It's

15 something like that. It's small.

16    Q   A small amount.

17    A   Hmmm.

18    Q   Didn't your social security go up by $120 last year?

19    A   I don't know.

20    Q   And if it did, wouldn't that have covered the payment

21 the father was indebted to you for?

22    A   No.

23    Q   Okay. You know that John Sakon went bankrupt in 2019.

24 Is that correct?

25    A   I don't know.

26    Q   Do you think that you having the father arrested six

27 times for a total of --

1          ATTY. O'TOOLE:  Again, we are off under these

2      arrest.

3          THE COURT:  Sustained. I thought I ruled on

4      that.

5          MR. SAKON:  Okay.

6  BY MR. SAKON:

7      Q   So you are setting up financial obligations with a

8  agency that does not exist in the law as a condition of the

9  father seeing his child?

10     A   Is that a question or a statement?

11     Q   That's a question.

12     A   So am I -- yes, or no?

13     Q   Yeah. Yes or no.

14     A   No.

15     Q   No. Okay. Where was that statement incorrect?

16     A   I don't remember the statement even at this point so.

17     Q   Ms. Sevine, you -- Mr. O'Toole, is your attorney is

18  he not?

19     A   I answered that earlier.

20     Q   Has he not advised you as to the law of visitation?

21     A   Whatever is happening between my attorney and I, is

22  none of your business.

23     Q   Can visitation be condition upon a financial payment?

24  Yes or no, in your mind.

25     A   No.

26     Q   But your condition the visitation on the financial

27  payment of the father to the therapeutic --

1    A    No, I'm not.

2    Q    I'm sorry.

3    A    No. My only concern is that my child, Odin, has the

4    therapeutic support in place that he needs in order to have

5    visitation with his father who is seriously mentally ill.

6    Q    In your mind.

7    A    No. There is a psychological evaluation.

8    Q    Okay. So as, to this alleged mental disability, so

9    you're that this Court should be allowed to discriminate

10   based upon the father's disability?

11   A    No that's not what I said.

12   Q    Then what did you say? I mean you're saying that the

13   father has a disability, has a mental disability --

14   A    I didn't say you had a disability. I said that you

15   have a mental illness, a very serious mental illness.

16   Q    Isn't a mental illness a disability under the law?

17   A    I don't know.

18   Q    Okay. Can you discriminate it against the person with

19   the disability?

20   A    I don't know that either.

21   Q    Okay. You know a little about John Sakon's history,

22   correct?

23   A    In what way?

24   Q    Didn't John Sakon raise two other children?

25            ATTY. O'TOOLE:   Again, this isn't relevant, Your

26       Honor.

27            THE COURT:   Sustained.

1      MR. SAKON:   Okay.

2   BY MR. SAKON:

3      Q    So this alleged mental illness predicated on a report

4   that was issued in 2019, is that correct?

5      A    And also by the -- John's previous therapist, Bob

6   Fogel.

7      Q    John's previous therapist, when was the last time

8   John saw the previous therapist?

9      A    I don't know.

10      Q    Isn't that relevant?

11      A    No.

12      Q    I'm sorry. Is the best interest of the child as of

13   today or is it the best interest of the child as of five

14   years ago?

15      A    Today of course.

16      Q    Okay. And didn't Dr. Smith, say in her testimony, you

17   were there, were you not? Were you there? Were you not?

18      A    Did she say what in her testimony?

19      Q    Were you there when Dr. Smith testified?

20      A    Yes.

21      Q    Did Dr. Smith not testify in the court that her

22   custody evaluation did not measure the current best interest

23   of the child as the date of her testimony? Yes, or no?

24      A    I would have to go back and look at what she said. I

25   don't know.

26      Q    Would it help you to look at the transcript?

27      A    I don't -- I don't remember everything that Dr. Smith

1  said during her testimony which went on for days, and days,

2  and days.

3    Q    It went on for days, and days, and days. Did John

4  Sakon file a motion --

5    A    It was a 29-day trial --

6    Q    And John Sakon filed a motion to eliminate because

7  you produced a report in December 2019 for a decision that

8  was entered in, on July 2022. How could Dr. Smith's report -

9  -

10             THE COURT:  Mr. Sakon, we need to get focused on

11       your motion.

12             MR. SAKON:  Okay.

13  BY MR. SAKON:

14    Q    You filed a complaint against John Sakon, did you

15  not? In D.C.F?

16    A    No.

17    Q    Then why did D.C.F. do a report on John Sakon?

18    A    I don't know.

19             MR. SAKON:  You have one of these?

20             ATTY. O'TOOLE:  Here.

21             MR. SAKON:  One for the judge. One for the

22       clerk.

23             THE COURT:  Are you offering an Exhibit B, Mr.

24       Sakon?

25             MR. SAKON:  Oh, I'm sorry. I would ask Exhibit B

26       to be made a full exhibit.

27             ATTY. O'TOOLE:  No objection.

```
1              THE COURT:  All right. Exhibit B is a full
2         exhibit.
3              MR. SAKON:  Now Exhibit C.
4    BY MR. SAKON:
5    Q    Have you seen this paper before?
6    A    Yes.
7    Q    As a matter of fact, you've given this paper to John
8    Sakon's lawyers have you not?
9    A    What?
10   Q    Did you not give the results of the D.C.F.
11   investigation of John Sakon to his employers? Yes, or no?
12   A    To who's lawyers? No.
13   Q    Did you not give a copy of this to the CREC system
14   where Mr. Sakon was working?
15   A    Yes.
16   Q    Okay.
17   A    I gave it to his school at the time. He's in a
18   different school.
19   Q    Isn't this sealed by law?
20   A    No.
21   Q    Weren't you instructed that this document was sealed
22   by law?
23             THE COURT:  Mr. Sakon, could we get back to your
24        motion, please.
25             MR. SAKON:  Okay.
26   BY MR SAKON:
27   Q    Doesn't this document say that D.C.F finds that John
```

1  Sakon does not post a risk to the health, safety, well-being

2  of children? Yes, or no?

3     A   That's the boxed that's checked, yes.

4     Q   Yeah. Okay. Okay. Now I asked you another question.

5  You're so fearful of John Sakon, were you fearful of John

6  Sakon before August 9th --

7            ATTY. O'TOOLE:  There is an assumption here. I

8        don't know where this fearful thing comes from.

9  BY MR. SAKON:

10    Q   Are you fearful of John Sakon?

11    A   Yes.

12    Q   Were you fearful of John Sakon before August 9, 2016,

13 when he told you he wanted a divorce?

14    A   Yes.

15    Q   You were?

16           THE COURT:  Mr. Sakon --

17           MS. SEVINE:  But he didn't tell me he wanted a

18       divorce.

19           THE COURT:  This has nothing to do with your

20       motion for contempt. I'm going to give you one more

21       chance to focus on that motion for contempt, and then

22       we are done.

23           MR. SAKON:  Okay.

24           MS. SEVINE:  I'd like to just clarify that --

25           THE COURT:  Ma'am (indiscernible) --

26           MS. SEVINE:  -- that conversation never

27       happened.

1           THE COURT:  Ma'am, ma'am -- just --

2           MS. SEVINE:  Okay.

3    BY MR. SAKON:

4     Q    It's your desire to move to Colorado, isn't it?

5     A    No.

6     Q    It's your desire to relocate, isn't it?

7     A    No.

8     Q    Wasn't that your desire, stated desire in the trial?

9    Relocation?

10    A    I asked for a relocation, and it was denied.

11    Q    And it was denied. It's no longer your desire to

12   relocate?

13    A    No.

14    Q    Okay. So why aren't you relocating?

15    A    Because it's not my desire.

16    Q    And if John Sakon doesn't exercise 75 percent of his

17   visitations in the first year, he loses his rights for

18   visitations, is that correct? In your mind?

19    A    I don't know.

20    Q    Okay. So doesn't it say that in the decision?

21    A    I don't know. I'd have to look at the decision.

22    Q    So how can John Sakon exercise 75 percent of his

23   visitation if you refuse visitation between the father and

24   the child?

25    A    I'm not refusing visitation.

26    Q    Okay.

27    A    I'm trying to comply with the court order.

1    Q    Okay. Let's go to the school events. Did you -- were

2    you notified that John Sakon was going to pick up Odin at

3    school in February? John Sakon notified you and the school

4    notified you. And he was going to have a --

5    A    What does this have to do with contempt?

6    Q    It has to do with contempt wasn't John Sakon showing

7    up if a supervisor to exercise his visitation. And he was

8    going to pick up the child at the school, just a second. On

9    February 1, 2023.

10   A    I don't remember the dates but somewhere around

11   there.

12   Q    And did you not take the child from the school at one

13   o'clock in order to interfere with that visitation?

14   A    Again there --

15   Q    Yes, or no?

16   A    No.

17   Q    Did you pick up the child prior to the school closing

18   so as to frustrate the visitation?

19   A    No.

20   Q    Did you pick up the child prior to the close of

21   school?

22   A    Yes.

23   Q    Okay. Why?

24   A    Because -- I'm getting a little bit, like -- I might

25   --

26            ATTY. O'TOOLE:  Can we take a short break?

27            MS. SEVINE:  Yeah, I need --

```
 1              MR. SAKON:  No. no. I don't want a short break
 2         at this point in time.
 3              MS. SEVINE:  I think I need a break.
 4              THE COURT:  All right. We're going to stand in
 5         recess for five minutes.
 6              MARSHAL: All rise, please. All rise, court
 7         stands in recess.
 8                   (Recess taken.)
 9              THE COURT:  Good morning. Come on up ma'am. You
10         may inquire.
11    BY MR SAKON:
12      Q   Ms. Sevine, how many conversations have you had with
13    John Sakon since August 10, 2016?
14      A   I don't know.
15      Q   Isn't it zero?
16      A   Maybe.
17      Q   So you have singular inability to talk to the father?
18      A   We use Our Family Wizard to communicate.
19      Q   I understand that but that's not the question. Do you
20    have a singular inability to talk to the father?
21      A   An inability?
22      Q   Yeah.
23      A   No.
24      Q   Then why don't you talk to the father?
25              THE COURT:  Mr. Sakon why is this relevant to
26         your motion for contempt?
27              MR. SAKON:  Because, Your Honor, she's saying
```

1    that there is fear here. And I'm going to show that

2    there is no fear here. Because she testified in prior

3    testimony that she's not in fear of the father before

4    the Court in November 2016.

5        THE COURT:  Why does it matter whether she's in

6    fear of you or not? Mr. Sakon, if you can't focus on

7    your motion for contempt this is going to end very

8    quickly.

9        MR. SAKON:  Okay.

10  BY MR. SAKON:

11    Q   Ms. Sevine, are you willing to enter into a parenting

12  plan with John Sakon at this time?

13    A   I don't know what that even means. There are orders

14  of the court in place. There was a very lengthy trial. There

15  was litigation for six years and now seven years.

16    Q   I just asked a question --

17    A   There is no parenting plan.

18    Q   Are you willing to do -- enter into a parenting plan

19  with John Sakon at this time? Yes, or no.

20        THE COURT:  Mr. Sakon that is irrelevant.

21    Whether she is or isn't, there are court orders that

22    have to be followed.

23        MR. SAKON:  Okay.

24  BY MR. SAKON:

25    Q   Ms. Sevine, on February 8th, I'm sorry. We dealt with

26  February 1st where John Sakon tried to have a visitation

27  with the child by picking up the child at school. And you

1    testified that you picked up the child early. There --

2          ATTY. O'TOOLE:  Again, Your Honor, I don't know

3       if this is relevant to the --

4          THE COURT:  You got to let him finish the

5       question.

6          ATTY. O'TOOLE:  Okay. Sure.

7          MR. SAKON:  Okay.

8  BY MR. SAKON:

9    Q   Did you on February 8, 2023, the following Wednesday,

10 John Sakon alerted you that he was going to pick up the

11 child at the school with a supervised visitation -- with a

12 supervisor. Is that correct?

13   A   I don't remember.

14   Q   You don't remember? Did you pick up the child at one

15 o'clock?

16         ATTY. O'TOOLE:  Again, Your Honor, I don't why

17      this is relevant to the --

18         MR. SAKON:  Again, it's a visitation, picking up

19      the child with a supervisor. My offer of proof is

20      that she showed up at school at one o'clock, picked

21      up the child to frustrate the visitations.

22         THE COURT:  The condition present to you having

23      supervised visit is you providing proof that you are

24      engaged with a clinician who can address narcissistic

25      personality disorder. Did you do that?

26         MR. SAKON:  Your Honor, I did that.

27         THE COURT:  And is that Exhibit A?

1    MR. SAKON:  Yeah.

2    THE COURT:  The Court finds that Exhibit A is

3    fully inadequate to meet the order that Judge Nguyen

4    issued.

5    MR. SAKON:  Your Honor, if I --

6    THE COURT:  It says you have requested

7    psychotherapy not that you are engaged.

8    MR. SAKON:  Your Honor --

9    THE COURT:  It doesn't say anything about Dr.

10   Lauerman ability to address narcissistic personality

11   disorder.

12   MR. SAKON:  Your Honor, I haven't put on my --

13   THE COURT:  The Court finds that this -- the

14   Court finds that this exhibit is wholly inadequate to

15   meet the requirements of Judge Nguyen set forth. The

16   motion for contempt is denied.

17   MR. SAKON:  Your Honor, may I have my closing

18   arguments at least. To put them on the record before

19   I bring you to federal court which I will do next

20   week for violation of Title II of the ADA. So if you

21   would allow me to put my -- my closing arguments on

22   the record. I will do so because I will bring you to

23   federal court along with Judge Nguyen because you

24   guys are walking all over my constitutional rights.

25   So if you would like to argue this in federal court

26   before a jury, I will do so.

27   THE COURT:  I've been to federal court before.

1        I've already ruled on your motion.

2              MR. SAKON:   Your Honor --

3              THE COURT:   Stand in recess.

4              MARSHAL: All rise, please. This court is in

5        recess. You may clear the courtroom.

6                    *                *                *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

| HHD-FA16-6071228-S | : | SUPERIOR COURT |
| FRANCELIA SEVINE | : | JUDICIAL DISTRICT<br>OF HARTFORD |
| v. | : | AT HARTFORD, CONNECTICUT |
| JOHN A. SAKON | : | MAY 4, 2023 |

C E R T I F I C A T I O N


        I hereby certify the foregoing pages are a true and
correct transcription of the audio recording of the above-
referenced case, heard in Superior Court, Judicial District of
Hartford at Hartford, Connecticut, before the Honorable Robert
Nastri Jr., Judge, on the 4th day of May, 2023.



        Dated this 14th day of November 2023 in Hartford,
Connecticut.


                          Johanna Maldonado-Daniels
                          Court Recording Monitor Trainee